# Elizabeth Pulliam, *per pro ami, v.* A. B. Pulliam *et al.*

Where the husband fraudulently possessed himself of two promissory notes belonging to the separate estate of his wife, and, with the proceeds thereof, purchased a tract of land, and took title to himself alone—held by the court, that such purchase created a resulting trust in favor of the wife, and the husband was decreed to convey said tract of land, by special warranty, to his wife, within thirty days, and a commissioner was appointed to execute such conveyance on default of the husband to do so.

Where the husband, by over-persuasion, threats and false pretences, induced his wife to convey, by deed duly executed, her separate estate, (being a house and lot,) to a third party, without consideration, who received the rents and profits thereof—held, that the deed was fraudulent and void, and that the wife was entitled to receive the previous and accruing rents and profits.

Where the husband married his wife for her property, and by false and fraudulent means defrauded her of her separate estate; reduced her from affluence to want; treated her with neglect and cruelty for a time, and then abandoned her and lived in open adultery with another woman, and also associated himself with a band of thieves—ordered by the chancellor, that the wife be divorced from the bed and board of the husband.

Elizabeth Pulliam, by her next friend, Joseph Leroy, complains that, on the 6th day of March, 1836, she was married to one Albert B. Pulliam, who was wholly destitute of property, but who had falsely represented to her that he owned a plantation and negroes; that, at the time of said marriage, said Elizabeth was entitled, as one of the heirs at law of her father, John Robb, late of the state of Louisiana, to the one undivided sixth part of the estate of said Robb, appraised at sixty thousand dollars; that she was also one of the heirs apparent of the estate of her mother, Hannah Robb; that said Hannah died on the 12th of December, 1836, leaving said Elizabeth her heir at law to one third of her estate; that in December, 1836, the estates of said Hannah and John Robb were sold under the laws of Louisiana for forty-eight thousand seven hundred dollars, exclusive of the crop of cotton then on the plantation—one third of the money was paid cash in hand, one third to be paid in twelve months, and the balance in twenty-four

months.   A. B. Pulliam, as the husband of said Elizabeth, received the amount of her portion of the cash payments, to wit: the sum of five thousand four hundred eleven dollars and eleven cents; and also received, from the purchaser of said property, two promissory notes, well indorsed, with statutory mortgage on the property sold, as security, for the sum of five thousand four hundred eleven dollars and eleven cents each, payable in twelve and twenty-four months.   At the time of said marriage said Elizabeth was also seized in fee simple of a house and lot in the city of Natchez, valued at ten thousand dollars; that said Pulliam rented said house and lot for seventy-five dollars per month, for the term of two years, and received the rents, amounting to the sum of eighteen hundred dollars; that said Elizabeth also owned other property to the amount of one thousand dollars, all of which said Pulliam has gotten into his possession, and disposed of some part thereof to his brother, Peter E. Pulliam, and others; that in December, 1838, A. B. Pulliam received four thousand dollars on one of said notes, and took a new note for the balance, payable in Louisiana in six months; that said Elizabeth and her husband, from their marriage until January, 1837, lived at the residence of her mother, in Louisiana, where she enjoyed all the conveniences and comforts, attendance and assistance of servants, as she had been accustomed to have and receive from her infancy, and as the delicate state of her health required, and at the same time enjoying the society of her sister, brother-in-law and friends and acquaintances generally; that, during their residence in Louisiana, her husband was continually importuning her to sell her house and lot in Natchez, and the notes above described, alleging, as a reason therefor, that he was largely in debt, and that the same would be seized upon by his creditors—but complainant refused to sell said property, believing that Pulliam wished to convert it into ready money for his own use, and then abandon her.   About the 13th of January, 1837, Pulliam went to the state of Mississippi and purchased a real or pretended pre-emption claim on a low point of land on the Mississippi river, with a log cabin thereon, and required said Elizabeth to remove with him thereto, which she did; that she found the place of her residence a low, swampy wilderness, where she was cut off from the society of her relatives and former friends, de-

prived of all society, with a miserable log shanty, far less comfortable than the log cabins of her father's slaves; that soon after her removal, owing to the unhealthy location and the afflicted state of her mind, her health rapidly declined; she was treated with neglect, indifference, personal rudeness and bodily harm by said Pulliam, who also failed and refused to supply her with the comforts, assistance and medical attendance which her condition required; that Pulliam renewed his solicitations to sell said house and lot in Natchez, and said notes, but, having heard that said Pulliam had declared that he married complainant for her property, and now believing, from his conduct, that such was his real object, she refused for a long time to sell said property, but finally, through fear of bodily harm from her said husband, complied with his wishes; that in May, 1838, said A. B. Pulliam, combining with his brother, Peter E. Pulliam, conveyed said Elizabeth to the town of Grand Gulf, where they had a deed prepared for her signature, whereby it was declared that, for the consideration of *one* dollar, the said Albert and Elizabeth Pulliam conveyed to said P. E. Pulliam the said house and lot in Natchez, which deed was acknowledged in the usual form and delivered to said P. E. Pulliam; that, at the same time, herself and husband executed an assignment of said notes to P. E. Pulliam, without any consideration therefor; all of which she charges was done to defraud her out of her property, and that, had she not been removed from her friends in Louisiana, and had she not been forced by personal violence and the promise of better treatment thereafter, she would never have signed said instruments of conveyance. Pulliam took his wife back to the log shanty, where she remained in a suffering condition until December, 1838, when he put her on a steamboat, without money and without protection, to go to see an uncle near Natchez; that she was landed at Natchez, and had to seek her uncle's residence alone; that Pulliam had promised to call for her in two weeks, but, not doing so, she returned to the log shanty, found it deserted, and all her furniture removed. Finding herself totally abandoned, she returned to her friends in Louisiana, on whom she has been, and is now, solely dependant for clothing and the necessaries to support a miserable existence; that said Pulliam, since he abandoned his wife, has remained on Big Black island, in

Elizabeth Pulliam, *per pro ami, v.* Albert B. Pulliam *et al.*

the Mississippi river, consorting with a set of lawless men, who are universally regarded, by all persons in the neighborhood, as a gang of banditti; that, during the whole time complainant lived with Pulliam, "he never allowed her one cent of money to purchase any articles which she might require, and that, so complete has been the system of robbery and wrong practiced on complainant, said Pulliam has disposed of all, or a large portion, of her household furniture, clothing, and even a fine gold watch and chain for which she paid two hundred dollars before her marriage, has been seized upon by said Pulliam."

The bill charges that P. E. Pulliam has re-conveyed said house and lot in Natchez, to A. B. Pulliam, and that said Peter has fraudulently received, without consideration, a conveyance from A. B. Pulliam to a tract of land in Claiborne county.

Complainant prays for an injunction restraining said Pulliams from disposing of or intermeddling with any of said property, or the rents and profits thereof, and from collecting said notes; that an account be taken and a receiver appointed; that said deeds of conveyance be declared void and cancelled, and that a divorce *a mensa et thoro* be granted. A *pro confesso* was entered against P. E. Pulliam.

The answer of A. B. Pulliam admits the marriage and receipt of the property, and the transfer of the same, and that with the money received on the notes he purchased a tract of land in Claiborne county, as stated in the bill; but denies all fraud and ill-treatment of complainant; denies that he abandoned her, but charges that she abandoned him; says he always treated her with kindness, and furnished her all the comforts of life; says he did not marry her for her property, but for love; that since she left him he has urged her to return to him, and offered her money, but she refused both, and that he is now willing to receive her and perform his marriage vows; denies all the material allegations on which the equity of the bill rests.

After this answer two supplemental bills were filed, charging that Pulliam had received the money on both of the notes for $5411 11 cents each, and also that he was living in open adultery with a woman by the name of Cissna; these charges were not denied.

The deposition of Daniel Green states, that Albert B. Pulliam

LAW SCHOOL LIBRARY.

Elizabeth Pulliam, *per pro ami*, v. Albert B. Pulliam *et al.*

removed from the place he was living at about four miles above Grand Gulf to Big Black Island, in the fall of 1838. He took a portion of his furniture and household stuff with him; he continued to live alternately at both places, until the fall of the year 1841; during all that time he appeared to be travelling about, and whenever he got home he had a large gang of persons with him ; the general character of these persons with whom he associated during that period were reputed to be thieves and robbers. There were a great many depredations committed in the neighborhood of Big Black Island during that period, and it was reported they had a considerable quantity of counterfeit money in their possession. In the fall of the year 1841, a company of the citizens of Claiborne county proceeded to Big Black Island, in consequence of the general bad character of those living there, drove them off, and burned their wood and their shanties; since which no depredations have been committed there, or in that neighborhood. Since the fall of 1841 A. B. Pulliam has not returned to this part of the country. He always went armed. Some time in June 1840 he took up with a woman of the name of Cissna, a daughter of William Cissna, and lived with her at the same place where he used to live with his wife ; he lived with her, and *Pulliam told* witness he kept her as a wife, and slept with her; he continued to live with her until he was run off from Big Black Island. In 1839 he kept a yellow girl at the same place. I do not think from my knowledge of the character of said Pulliam, that any decent woman or one having a regard for the moral proprieties of life, would live with him or could live with him in credit or in safety. Some time in the year 1841 I heard Pulliam say he owned a house and lot in Natchez, and he had it fixed so that nobody could get it. I heard him say it was worth ten thousand dollars—I heard him say he rented it at one hundred dollars per month, and subsequently at seventy-five dollars. The woman Cissna left the place where they had been living, at the same time he, Pulliam did, and by his orders and directions, and aided in packing up the furniture and stuff to go off with. During the period of the above transactions I lived within about a quarter of a mile of said Pulliam. During the time Mrs. Pulliam lived with him at this place his course of conduct was about the same, having always had a gang about him.

Elizabeth Pulliam, *per pro ami*, *v.* Albert B. Pulliam *et al.*

B. W. Parr says the same as Green, and further " was present when Pulliam took the woman Cissna in a skiff on board the Empress ; he said he was going to take her to Princeton to marry her, for if he married her down here his wife would make a fuss about it." William Gyles states that he is acquainted with the parties to this suit, " that both before and after the separation of A. B. Pulliam and his wife, he heard Pulliam say that he married his wife for her property, he also stated repeatedly to witness that as soon as he could get his wife's property into his own hands, damn her, he intended to quit her, and he would not live with her any longer; after they separated, Pulliam told witness that he would not live with her any longer ; that he had got all of her property fixed so that she nor any of her relations could get any of it ; that he did not intend she should have any of it." These declarations were made to witness some twenty times, and Pulliam generally concluded his remarks by saying "By God he married her for her property," he also said he was glad her brothers and sisters would support her, that he was tired of her ; Pulliam has never allowed her any thing for her support since their separation; witness and his brother has supported her all the time ; she has been in delicate health, and has needed the assistance of servants and medical attendance ; thinks one thousand dollars would be a reasonable allowance for her support one year; Pulliam received the money on two notes for $5,411 11 each, and gave none to his wife. Immediately after the separation Mrs. Pulliam came to witness' house in a destitute condition ; had on an old calico dress and one thin under dress, one old pair of stockings full of holes, and one pair of coarse pegged [shoes with holes in them; this was all the clothing Mrs. Pulliam had. In December, 1839, Pulliam told witness that he was one of the Murrell gang, and he did not care who knew it. In December, 1838, witness had a conversation with defendants both together, in which P. E. Pulliam said that Albert and his wife had made a deed to him for the house and lot in Natchez. Albert replied he had it fixed so that his wife nor none of her relations could ever get any of it ; Peter made no reply to the contrary, and Albert at the same time observed that he got the rent of the house and lot, and he could make Peter do just as he pleased, and Peter made no reply to the contrary.

30*

Elizabeth Pulliam, *per pro ami, v.* Albert B. Pulliam *et al.*

James A. Maxwell states, that in May, 1838, A. B. Pulliam wrote him a letter which is made an exhibit to his deposition, in which he says "there is a house and lot come by my wife, it being real estate, I cannot hold it I believe if she decease first. I wish to make a conveyance to my brother, and then from him to me, so as the title may lay in me; for instance, sell to him and him to me. I have a copy of the deed which I will bring with me. Likewise I wish to sell to him two notes of hand which I showed to you last winter, for ready money." This letter was delivered by P. E. Pulliam, who was familiar with the subject matter of the same and a party to the fraud. A few days after this A. B. Pulliam and his wife and P. E. Pulliam called on witness and he drew the deed for the house and lot in Natchez, and the assignment of the two notes as set forth in complainant's bill; says no consideration money was paid, and from the conversation of the parties, none was to be paid.

James A. Maxwell for complainant.

Rucks & Yergers for defendants.

The Chancellor.

It has not been my lot to examine a case in which there is so much wickedness and depravity displayed as in the one before me. It appears that the complainant, on her marriage with the defendant, A. B. Pulliam, was the owner of a house and lot in the city of Natchez, estimated to be worth ten thousand dollars, and was also entitled to an undivided sixth part of the estate of her father, in Louisiana, estimated at sixty thousand dollars. That she had been raised in ease and affluence. That immediately after the marriage the parties went to Louisiana, where they continued to reside with her friends, until January, 1837, when they removed, against the wishes of the wife, to this state. In the mean while, the husband had procured the possession of two promissory notes for five thousand four hundred and eleven dollars each, as a part of the distributive share of his wife in the estate of her father. It appears that after their removal to this state, the husband, by repeated importunities, made under various pretexts, procured his

wife to unite with him in a conveyance of her house and lot in Natchez, and in an assignment of the notes to his brother, P. E. Pulliam, who is made a defendant to the bill. That after he accomplished this purpose, he abandoned his wife, leaving her in a delicate state of health, and wholly without the means of subsistence. The proof shows that no consideration was paid, or secured to be paid, by the brother, who thus became ostensibly the purchaser of the property.

It is also in evidence, that the husband, under pretext of being the agent of his brother, has since continued to exercise control over the house and lot, and to receive the rents and profits; and he admits in his answer, that he received the proceeds of the notes and invested them, in part,·in a tract of land in Claiborne county. It is obvious from these facts, that the sale to the brother was merely colourable, and was a fraudulent contrivance, intended to wrest from the hands of the wife any control over her property during her life, and to secure to himself the reversion, if she should die without issue. It is moreover in evidence, that the defendant, A. B. Pulliam, who was very poor, has repeatedly been heard to say that he married the complainant for her property, and that he had then got it fixed so that neither she nor her relations should have any of it.

It is impossible, after a recital of these facts, to resist the conclusion, that A. B. Pulliam was influenced in his marriage with the complainant by the most unworthy and treacherous purposes, and that all his subsequent conduct, with reference to her property, was governed by the most corrupt design, which design he accomplished only by making his brother, who is his co-defendant, also his co-worker in iniquity. The result of these machinations has been to divest the complainant of an estate which gave her a handsome independence, to which she was separately entitled, both by the laws of this state and of Louisiana, and to throw her upon the charity of her friends for a precarious subsistence.

It only remains to declare the mode of restoring to the complainant the rights of which she has been thus wrongfully deprived. The admission in the answer, that the tract of land in Claiborne county was purchased with the money of the complainant, creates a resulting trust in her favor, which will be declared; and the de-

fendant, A. B. Pulliam, will be directed to convey said tract of land, by special warranty, to the complainant, within thirty days from the date of the decree. A commissioner will be appointed to execute such conveyance on default of said Pulliam. The deed to P. E. Pulliam for the house and lot in Natchez, is declared fraudulent and void, and the complainant held to be entitled to receive the previous and accruing rents and profits thereof, as also the subsequent rents and profits of the tract of land in Claiborne county. The defendants will be perpetually enjoined from receiving or asserting any right to such rents and profits. And I think that the defendant's conduct in having adopted another woman as his wife, as is fully proven, connected with his heartless abandonment of his lawful wife, and his fraudulent attempt to cheat her out of her property, are considerations sufficiently strong in law and in fact to at least warrant me in granting the prayer of the bill for a divorce from bed and board. The defendants must pay the costs of the suit.

Let a decree be prepared accordingly.